**SO ORDERED.**

**SIGNED this 01 day of February, 2008.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re:<br><br>LAMAR MALTBIA,<br><br>DEBTOR. | CASE NO. 06-41166<br>CHAPTER 13 |

### MEMORANDUM OPINION AND ORDER OVERRULING DEBTOR'S OBJECTION TO CLAIM #1 OF THE INTERNAL REVENUE SERVICE

Following trial, the Court took under advisement Debtor's Objection to Claim #1 of Internal Revenue Service (IRS).[1] There is no objection to venue or jurisdiction over the parties, and the Court has jurisdiction over this matter.[2] Having heard the evidence,

---

[1] Doc. 26.

[2] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b) as well as the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. An objection to a claim is a core proceeding that this Court may hear and determine pursuant to 28 U.S.C.§ 157(b)(2)(B).

evaluated the credibility of the witnesses, and considered the relevant law, the Court overrules the objection.

## I. POSITIONS OF THE PARTIES.

The IRS filed a claim in the bankruptcy of Debtor, Lamar Maltbia, which consisted of an unsecured priority claim for $9,123.33, and a general unsecured claim for $257.88. These liabilities arose for tax years 2004 and 2005 and were assessed by the IRS after it disallowed Debtor's inclusion of three minor children as his dependents. Debtor objects to the denial of the deduction for the children, claiming that he was entitled under the Internal Revenue Code (IRC) to claim the children as dependents for three reasons. First, he claims that during 2004 and 2005, the children resided with him. Second, he claims he provided more than half of their total support. Third, although admitting he is not the biological father of the children, he contends he is entitled to a deduction for the children because during 2004 and 2005 he was the common law husband of their biological mother, Latika Phelps.

## II. APPLICABLE LAW

Once the IRS shows that it has made an assessment, which fact is not challenged here, the taxpayer bears the burden of proving he is entitled to the claimed deductions.[3] To claim children as dependents, the taxpayer must show that each child is a "qualifying child," which term is defined by the IRC and contains four prongs.[4] The four prongs are:

---

[3]*INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992).

[4]26 U.S.C. § 152(c)(1).

2

(1) the "relationship" prong,[5] requiring that the claimed dependents be the taxpayer's children (including stepchildren), brothers, sisters, stepbrothers, stepsisters, or descendants of any of these relatives;[6] (2) the "residence" prong, requiring that the alleged dependents have the same principal place of abode as the taxpayer for more than half of the tax year;[7] (3) the "age" prong,[8] requiring that any alleged dependent be less than 19 years of age or a student under age 24 at the close of the tax year;[9] and (4) the "support" prong, requiring that the taxpayer provide more than half of the alleged dependent's total support for the tax year.[10] The IRS contends Debtor fails both the relationship prong and the support prong as to all three children.

Since Debtor admits the children are not related to him by blood and that he was not married to their mother in a religious or civil ceremony performed after obtaining a marriage license, he attempts to satisfy the relationship prong by claiming a common law marriage to the children's mother. Whether a marriage is recognized for tax purposes depends on the laws of the local jurisdiction where the marriage occurred.[11] There is no dispute that Kansas law is applicable here.

---

[5] 26 U.S.C. § 152(c)(1)(A).

[6] 26 U.S.C. § 152(c)(2).

[7] 26 U.S.C. § 152(c)(1)(B).

[8] 26 U.S.C. § 152(c)(1)(C).

[9] 26 U.S.C. § 152(c)(3).

[10] 26 U.S.C. § 152(c)(1)(D).

[11] *E.g, Sullivan v. Comm'r*, 256 F.2d 664, 666 (4th Cir. 1958).

Kansas recognizes common law marriages.[12] In Kansas, the party asserting a common law marriage has the burden to establish three elements: "(1) capacity of the parties to marry; (2) a present marriage agreement between the parties; and (3) a holding out of each other as husband and wife to the public."[13] For the reasons stated below, the Court finds there was not a common law marriage between Debtor and Ms. Phelps in 2004 and 2005. Because Debtor's objection to the IRS Proof of Claim must be denied based upon this finding alone, the Court does not decide whether Debtor satisfied the support prong of the dependency test.[14]

**III. FINDINGS OF FACT.**

On his 2004 and 2005 federal income tax returns, Debtor claimed a filing status of "head of household" and claimed Ms. Phelps' three children (DC, DJ, and DP) as his dependents. In 2006, the IRS disallowed Debtor's claim of the three children as dependents for the 2004 and 2005 tax years, denied his status as head of household, and assessed 2004 and 2005 taxes against Debtor as "single" with no dependents.

Debtor and Ms. Phelps were the only witnesses at trial. Their testimony clearly establishes that during 2004 and 2005, Debtor, Ms. Phelps, and her three children, lived together. Both testified they discussed marriage and decided not to have a marriage

---

[12]*In re Estate of Antonopoulos*, 268 Kan. 178, 192, 993 P.2d 637, 647 (1999) (finding common law marriage when two additional persons witnessed private ceremony at which parties exchanged rings).

[13]*Id.*

[14]That said, the evidence was absolutely clear that Debtor did not satisfy the support prong in 2005 for DP, the child whose biological father had died. The monthly Social Security benefit that Ms. Phelps received on that child's behalf beginning at least in 2005 represented well more than one-half of his support.

4

ceremony because they had no money for a wedding and because "it is just a piece of paper."  The Court assumes that the piece of paper they referred to is a marriage license.

Ms. Phelps testified the parties exchanged rings in December 2001, but that she "did not bring her ring" to court the day of the trial.  Unfortunately, Debtor had indicated in sworn interrogatory answers that he moved in with Ms. Phelps almost an entire year later, in November 2002, and that they purchased weddings rings at that time, but that the rings were subsequently stolen and later replaced.[15]

Ms. Phelps, explaining why she and Debtor elected not to obtain a marriage certificate, offered the following testimony at trial.  She testified that not getting "officially" married "would be the best situation for me, because we were together but nobody can determine how long somebody will actually be together.  So that is why we did it the way we did."  She reasoned that her status with Debtor provided an easier alternative to marriage because no one knows "who is going to last forever and who is not—it could be either 4 - 5 years, 6 months or one month."

Debtor also testified that he had a conversation with Ms. Phelps regarding their relationship.  He testified their discussion was, essentially: "She gonna be my wife and I her husband. We didn't need no paper to prove marriage. . . . common law marriage and things like that."[16]

---

[15]Trial Exh. B, Interrogatory 9 (bates US0051).

[16]Recording of trial at 2:02.

5

The record is wholly inconsistent as to the date of the alleged common law marriage. In an affidavit dated July 2007, filed in this case, Ms. Phelps stated: "That she is the common-law wife of the Debtor, Lamar Maltbia, that they have continuously lived together since 2002, that they have been common law married since 2004."[17] In pretrial interrogatories propounded to Debtor by the IRS, however, Debtor stated: "I moved into the house [with Ms. Phelps] in November 2002 and we immediately referred to each other as husband and wife. We had discussed marriage and believed that a common-law marriage would be easier."[18]

These inconsistencies continued at trial. Ms. Phelps testified that the relationship started in September 2001 and that they exchanged rings in December 2001. Debtor, after hearing Ms. Phelps so testify, also testified they exchanged rings in December 2001, yet this was in direct conflict with his prior sworn interrogatory answers. Furthermore, upon cross-examination Debtor acknowledged that he did not know what a common law marriage meant until he spoke with his attorney in preparation for trial.[19]

Debtor testified that he and Ms. Phelps hold themselves out as husband and wife to others, such as to Ms. Phelps' sister and friends.[20] Moreover, in response to an

---

[17]Doc. 49.

[18]Trial Exh. B, Interrogatory 10 (bates US0052).

[19]Recording of trial at 2:02. This misunderstanding is corroborated by the fact that when he filed his 2006 federal income tax return in April 2007, which he did *after* IRS had disallowed his deduction of the three dependents for the 2004 and 2005 tax years, he did not assert that he was the head of the household (i.e., married), but instead claimed to be single. This tends to demonstrate that even as late as April 2007, he did not understand the concept of common law marriage.

[20]Recording of trial at 2:06.

6

interrogatory question, the responses to which were admitted into evidence at the request of the IRS, Debtor stated: "We held ourselves out as a married couple to the following: Lamar's family members, Ms. Phelps' family members, the kid's teachers, pastor, people at the church, neighbors, kids and basically the public at large."[21]

However, Debtor's actions to do not coincide with this testimony. Debtor neither listed witnesses in the Pretrial Order,[22] nor called any witness at trial to corroborate this statement (other than Ms. Phelps). He admitted that he and Ms. Phelps maintained no joint accounts. He did not offer as evidence copies of any documents, such as applications, leases, checks, automobile titles, tax bills, or sales receipts, where he and Ms. Phelps held themselves out as husband and wife. He testified they maintained no joint accounts. Yet on four separate insurance summaries for 2004 that *were* admitted into evidence, Debtor is listed as "male, single/separated."[23] And although copies of the children's school pupil information forms for 2004 signed by Ms. Phelps do list Debtor as the father of the children and Ms. Phelps as their mother, there is nothing in that form to show that Ms. Phelps and Debtor are husband and wife, or that Ms. Phelps ever used Debtor's last name.[24]

---

[21]Trial Exh. B, bates US0054.

[22]Doc. 66, para 11.2.

[23]Trial Exh. C, bates US0073-76.

[24]The Court places little emphasis on this latter fact, however, as many married women do not use their spouse's last name.

7

In his 2004 and 2005 federal income tax returns, prepared by a tax service, Debtor claimed the status as head of household. To qualify for head of household status, a taxpayer must not be married (or be a surviving spouse) at the close of the tax year. In addition, the taxpayer must maintain as his home a household that is the principal place of abode of a qualifying child or another dependent.[25] Debtor, therefore, represented himself as not married to the IRS in both of those returns.

Ms. Phelps did not file federal income tax returns for 2004 or 2005, so her claimed marital status is unknown from that source. She did, however, file three Chapter 13 bankruptcy petitions during the relevant time period, on July 30, 2003,[26] November 29, 2004,[27] and October 12, 2005.[28] All three petitions, at least according to her trial testimony, were filed after she claimed to be Debtor's common law wife.[29] On Schedule I in each case, which requests a debtor's marital status, however, she indicated "S," which this Court assumes means "single." That same form instructs that "[t]he column labeled 'Spouse' must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and joint petition is not filed."

---

[25] *See* 26 U.S.C. § 2(b).

[26] Case No. 03-41854. Her first case was dismissed January 29, 2004, for default in making plan payments.

[27] Case No. 04-43287. This case was dismissed July 7, 2005, for default in making plan payments.

[28] Case No. 05-43919. This case was dismissed October 5, 2007, for failure to resume plan payments after an order granting the temporary cessation of payments.

[29] Her first bankruptcy petition was filed in 2003, which was *before* her sworn affidavit says she and Debtor became common law married (in 2004), but after her trial testimony claims she was common law married (in 2001).

8

In Ms. Phelps' first bankruptcy filed July 30, 2003, she did not complete the section on Schedule I that requires a spouse's income information. All spaces asking for spousal information were marked "$0.00." The Schedule I in her second bankruptcy likewise said she was "S," single, but this time she did include $1,000 in monthly wages under the "spouse" column. The Schedule I in her third bankruptcy filed in October 2005 reverts back to single status, with no spouse income provided, as required.

Likewise, Chapter 13 debtors are required, in their Schedule of Financial Affairs (SOFA), to disclose wage information for their spouse for the two years prior to filing bankruptcy, even if they are not filing the bankruptcy jointly. Ms. Phelps testified she was "married" to Debtor in 2003 when she filed her first bankruptcy, but she failed to disclose his income on her SOFA. She likewise failed to include his income on her SOFA in each of the following two cases in 2004 and 2005. If Debtor truly had been married to Ms. Phelps when she filed those three bankruptcy proceedings, she was required to list his income. Thus, the documentary evidence completed at a time when Ms. Phelps did not know that her marital status would be dispositive of the issue in this case is inconsistent with her testimony that she was married to Debtor during the relevant time period.

Likewise, Debtor filed his petition in this case without listing the name of any joint debtor/spouse on Schedule I. At the top of Schedule I, under "Debtor Martial Status," he stated he was single with the notation "S." He did, however, list the three children as dependents on Schedule I. In addition, he reflected $240 monthly income for

9

Ms. Phelps, as well as $479 in social security or other government assistance, which the Court finds was for payment to Ms. Phelps' child, DP, who became entitled to receive Social Security benefits beginning in 2004 or 2005 after his biological father died. So Debtor's Schedule I was internally inconsistent as to whether he considered himself married or single.

Like Ms. Phelps, Debtor implied he had no spouse in completing his SOFA. He included no income for her for the prior two years at the same time her own bankruptcy schedules show she did have income during the relevant disclosure period. He also was required, on Form B22C (means test form), to indicate his marital status on the very first question. Debtor did not check either available block to disclose his marital status.

Turning to Debtor and Ms. Phelps' testimony at trial concerning their relationship, both testified that they did not believe that the marriage was legally official because they had no "piece of paper." They explained that they did not assert their marital relationship on "official" or government documents—such as their bankruptcies and their tax returns, because they did not want to get in trouble with the government by asserting a marriage when they did not have an "official" piece of paper. In fact, Debtor testified that he believed it would be fraudulent to claim to the government that he was married when they did not have a marriage license.[30]

---

[30] Recording of trial at 2:04

10

## IV. CONCLUSIONS OF LAW

The three basic constituents of a common law marriage, set forth above, have been established by a long line of decisions from the Kansas Supreme Court.[31] Each of the three elements, capacity to marry, a present agreement, and holding out to the public, must be established.[32] "The capacity to enter into a common law marriage requires the ability to understand the marital contract, its duties, and responsibilities, no existing marriage, and the requisite age . . . ."[33] In this case, IRS has stipulated to the parties' capacity.

The second element requires a present marriage agreement between the parties, rather than an agreement to be married in the future.[34] Cohabitation, coupled with a promise to marry, does not evidence a common law marriage.[35] "However, the present marriage agreement need not be in any particular form."[36]

In this case, the evidence of a present agreement is not strong. Both Debtor and Ms. Phelps testified that they agreed to be husband and wife, but the evidence of what

---

[31] *Fleming v. Fleming*, 221 Kan. 290, 292, 559 P.2d 329, 330-31 (1977).

[32] *Id.*, 221 Kan. at 292, 559 P. 2d at 331.

[33] 1 Kan. Law & Prac., Linda D. Elrod & James P. Buchele, Family Law § 3.31(1) )(4th ed.). This treatise states the requisite age is 12 for females and 14 for males. K.S.A. 23-101 now provides: "The state of Kansas shall not recognize a common-law marriage contract if either party to the marriage contract is under 18 years of age."

[34] *Pitney v. Pitney*, 151 Kan. 848, 853, 101 P.2d 933, 936 (1940).

[35] *Id.*, 151 Kan. at 852, 101 P. 2d at 935; *Schrader v. Schrader*, 207 Kan. 349, 484 P.2d 1007 (1971).

[36] *Huss v. Keimig*, 215 Kan. 869, 872, 528 P. 2d 1228, 1230 (1974), *citing Cain v. Cain*, 160 Kan. 672, 676, 165 P.2d 221, 223 (1946).

11

date the parties formed that alleged agreement to marry is in serious conflict. Ms. Phelps' sworn affidavit says it occurred some time in 2004, while her trial testimony suggested it occurred three years earlier, in December 2001. Debtor's sworn interrogatory answers suggest their agreement to be married occurred in 2002, but upon cross examination, and after hearing Ms. Phelps claim they agreed to be married in December 2001, he then attempted to explain away the inconsistent interrogatory answer by claiming he was not good with dates.

Further, Ms. Phelps' testimony regarding a **present** agreement to marry was ambiguous. Her testimony is consistent with having both a present agreement to marry and a decision not to marry, "because one does not know how long a relationship may last." The testimony seemed to imply it was just easier on everyone not to get married, because then she would not have to go through the trouble of a divorce if the relationship did not work out.

The credibility of Debtor's testimony concerning his entry into a common law marriage agreement, and the time frame for doing so, is further impaired by his acknowledgment that he did not even know what a common law marriage was until he met with his attorney prior to trial. Nevertheless, because Debtor does not have an enhanced burden of proof, and because there is no evidence refuting a private agreement between Ms. Phelps and Debtor, the Court finds that the second element is satisfied based upon the consistent testimony that the parties intended and agreed to be husband and wife.

12

The third element, holding oneself out to the public as married, has been described as follows:

> This requirement mandates that the parties must publicly and professedly live as husband and wife. The purpose is to prevent fraudulent claims by providing some type of objective standard or "public notice." It also provides clear evidence of the intent and the agreement to be married.
>
> Various types of activities which constitute a holding out to the public as husband and wide include cohabitation, using the same last name, filing joint tax returns, opening joint bank or savings accounts, joint ownership of property, pooling resources, the woman using the man's last name on a driver's license and in daily affairs, designating the other person as spouse and beneficiary on insurance policies, having children and generally gaining a reputation in the community as husband and wife. [37]

Debtor's evidence fails to satisfy these criteria. Notwithstanding Debtor and Ms. Phelps' testimony, the Court finds there is insufficient objective or corroborating evidence for the Court to find in Debtor's favor.

First, Debtor offered no testimony of a third party to whom Debtor had held himself out as married. His testimony was that he had done so to a variety of people, but he offered no corroborating evidence. Second, there is no evidence that Ms. Phelps ever used Debtor's last name for a driver's license, or any other purpose, including in her three bankruptcies. Third, Debtor offered no documents showing joint interests in property, such as bank records or vehicle titles, or two party transactions, such as sales

---

[37] 1 Ks Law & Pract, Linda A. Elrod & James P. Buchele, Family Law at § 3.31(3)

13

receipts, credit applications, or public benefit applications.  In response to interrogatories, Debtor claimed that both his and Ms. Phelps' names were on two leases, but Debtor failed to offer either lease into evidence.  In response to interrogatories, Debtor also stated that "the car insurance is in both our names," but the four copies of auto insurance summaries admitted into evidence refer only to Debtor, and further indicate he is "male, single/separated."

The only documents in evidence bearing both Debtor's and Ms. Phelps' names are the school pupil information forms for her three children, which she signed and where she identified Debtor as the children's father.  But Debtor is never identified as Ms. Phelps' spouse.

In stark contrast to his testimony at trial that he held himself out as married, however, Debtor's sworn bankruptcy schedules, which were filed at a time when he apparently did not understand the tax significance of being married to the children's mother, stated that he was single on Schedule I, and impliedly on his SOFA when he failed to reveal Ms. Phelps' income.  Moreover, a review of other schedules shows none of the debts are listed as joint, and there is no codebtor identified.  His representation to the IRS made under penalty of perjury that he was not married during the two tax years relevant to this case (to obtain head of household status), was consistent with similar representations he made to the bankruptcy court in his filings.  Similarly, Ms. Phelps filed three bankruptcy petitions before Debtor filed his, and she also held herself out as a single person on three Schedule I forms, and three SOFAs.

14


Debtor's and Ms. Phelps' testimony that they believed it would be improper to claim a marriage status on government documents based upon a common law marriage was credible, but its weight is significantly minimized by Debtor's admission that he did not know what common law marriage meant until he consulted with counsel before trial. In addition, his failure to provide any documentary evidence or testimony of third party witnesses to corroborate that he otherwise held himself out to be married, is very problematic. This left only his self-serving testimony to demonstrate something that should be easy to demonstrate if he truly held himself out as married.

In light of the significant weakness of Debtor's evidence that a present agreement to marry existed, the Court finds that he was required to provide strong evidence of holding himself out to the public as married. This is particularly important as a safeguard to avoid a fraudulent claim of marriage. The Court recognizes that an individual in financial circumstances similar to Debtor's, where oftentimes transactions are handled in cash, will have fewer opportunities to create a "paper trail" of financial documents reflecting a common law marriage. In such a circumstance, testimony of those familiar with the parties that they held themselves out as husband and wife becomes crucial. Yet Debtor offered no testimony of witnesses other than Ms. Phelps, who because she co-habitates with Debtor and relies on him for support, has a similar incentive to testify in a fashion that will result in a significant reduction to, or even the elimination of, a non-dischargeable priority tax liability.

In this case, where Debtor is claiming a common law marriage for the purpose of avoiding a significant tax liability, there is obviously a significant opportunity for fraud. For that reason, the Court finds that independent evidence that Debtor actually did hold himself out to the public as married to Ms. Phelps was absolutely essential for Debtor to establish the common law marriage, especially because the Court found the witnesses' testimony to be more convenient than convincing on the relationship prong. Because Debtor and Ms. Phelps repeatedly held themselves out as single to the public, during the relevant time period, in their collective bankruptcy and tax filings, all made under penalty of perjury at a time when they did not understand the significance of that information, the Court finds that Debtor failed to provide sufficient credible evidence for the Court to find in his favor.

For the foregoing reasons, Debtor's objection to the IRS's proof of claim is denied. The linchpin of Debtor's objection is the assertion that for purposes of his 2004 and 2005 federal income tax returns, he was entitled to claim Ms. Phelps' three children as his dependents because their mother was his common law wife. Kansas law, on which the IRS relies to determine whether a Kansas resident is married, requires that a proponent of common law marriage establish three separate elements. Debtor has failed to credibly establish the required element that Debtor held Ms. Phelps out to the public as his common law wife during 2004 and 2005. Debtor's objection to the IRS claim is therefore overruled.

## Future Course of These Proceedings

The resolution of the allowance of the IRS claim was impeding confirmation, because a ruling against the Debtor renders the plan unfeasible. The Court assumes that this case will need to be dismissed, or converted, because there is nothing in the record to support a finding that the plan can cash flow the IRS priority debt. For that reason, the Court will likely dismiss this case if, within twenty days, Debtor does not convert the case, or file pleadings with the Court that either reflect the ability to cash flow a plan that includes the IRS priority claim, or reflects that IRS has agreed to a "lesser treatment" plan[38] that would allow Debtor to complete the plan. The Court continues the confirmation hearing to **February 27, 2008 at 1:30 p.m.**

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure, which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED**.

# # #

---

[38] 11 U.S.C. § 1322(a)(2) requires that a plan provide for full payment of all § 507 priority claims over the life of the plan "unless the holder of a particular claim agrees to a different treatment of such claim." Because it appears highly unlikely, with Debtor's education and training, as well as job history, that he will be able to pay this priority claim over the life of a plan, or anytime soon thereafter, Debtor may decide to seek a "lesser agreement" from the priority claimant. If Debtor has made an offer for a lesser treatment plan to the priority creditor within twenty days following this order, he can seek additional time until he receives a response from that offer before the Court will automatically dismiss the case.

Case 06-41166    Doc# 85    Filed 02/01/08    Page 17 of 17